RAJ V. ABHYANKER, California SBN 233284
Email: raj@legalforcelaw.com
WENSHENG MA, California SBN 299961
Email: vincent@legalforcelaw.com
NICHOLAS CRAFT, (*pro hac vice*)
Email: nick@legalforcelaw.com
LEGALFORCE RAPC WORLDWIDE, P.C.
1580 W. El Camino Real, Suite 10
Mountain View, CA 94040
Telephone:    (650) 965-8731
Facsimile:    (650) 989-2131

Attorneys for Plaintiff,
LegalForce RAPC Worldwide, P.C.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| LEGALFORCE RAPC WORLDWIDE, P.C., <br><br> Plaintiff, <br><br> v. <br><br> TRADEMARK ENGINE LLC; TRAVIS CRABTREE; and DOES 1-50, <br><br> Defendants. | Case No.:  3:17-CV-07303-MMC <br><br> **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SANCTIONS** <br><br> Date:        September 3, 2019 <br> Time:        9:00 am <br> Dept.:       Courtroom E, 15th Floor <br> Judge:       Hon. Elizabeth D. LaPorte |

**TABLE OF CONTENTS**

**I.  INTRODUCTION**                                                                                    **4**

**II.  BACKGROUND FACTS**                                                                          **5**
    A. Protective Order                                                                       5
    B. TME's Assertions of Broad Over-Designations                   6
    C. TME's Production By the Numbers                                      8

**III. LEGAL STANDARD**                                                                            **8**

**IV. ARGUMENT**                                                                                         **10**
    A. RAPC Initial Designation of Over 10,000 Survey Communications as AEO Was
       Justified                                                                         10
    B. RAPC Acted Quickly to Cooperate When it Learned of Mistakes       12
    C.  TME's Production Fails its own Motion for Sanctions             13

**IV. CONCLUSION**                                                                                     **14**

**TABLE OF AUTHORITIES**

<u>Cases</u>

*Applera Corp. v. MJ Research, Inc.*
 389 F.Supp.2d 344 (D.Conn. 2005)…………………………….……………..…11

*Del Campo v. Am. Corrective Counseling Servs., Inc.*
 No. C-01-21151JWPVT, 2007 WL 3306496 (N.D. Cal. Nov. 6, 2007)…………………9

*Farnsworth v. Proctor & Gamble Co.*
 758 F.2d 1545 (11th Cir. 1985) …………………………………….……………. 11

*Humphreys v. Regents of Univ. of California*,
 No. C04-03808 SIEDL, 2006 WL 3020902 (N.D. Cal. Oct. 23, 2006) ……….……9, 14

*Humphreys v. Regents of Univ. of California*,
 No. C04-03808 SIEDL, 2006 WL 3302444 (N.D. Cal. Nov. 14, 2006) ……..……… 9

*In re Itel Sec. Litig.*,
 791 F.2d 672 (9th Cir. 1986)………………………………………….………….....… 9

*Lampshire v. Proctor & Gamble Co.*,
 94 F.R.D. 58 (N.D.Ga. 1982)……………………………………….……………..……8

*Nutratech, Inc. v. Syntech (SSPF) Int'l, Inc.*,
 242 F.R.D. 552 (C.D. Cal. 2007)……..………………………………….……… 10

*Oklahoma v. Tyson Foods, Inc.*,
 No. 05-CV-329-GKF-PJC, 2009 WL 10271835 (N.D. Okla. Mar. 11, 2009) ………10, 11

*Paradigm Alliance, Inc. v. Celeritas Techs., LLC*,
 248 F.R.D. 598, 605 (D.Kan. 2008) ……………………………….…………..….. 13

*Roadway Exp., Inc. v. Piper*,
 447 U.S. 752, 766 (1980) ……………………………………………………… 9

*THK Am., Inc. v. NSK Co., Ltd.*
 157 F.R.D. 637 (N.D. Ill. 1993)…………………………………………….…..… 13

*Ubiquiti Networks, Inc. v. Kozumi USA Corp.*,
 No. 12-CV-2582 CW JSC, 2013 WL 772664 (N.D. Cal. Feb. 28, 2013)……………… 20

*Youngevity Int'l, Corp. v. Smith*,
 No. 16CV00704BTMJLB, 2017 WL 6541106 (S.D. Cal. Dec. 21, 2017)……………… 9

*Youngevity Int'l, Corp. v. Smith*,
 No. 16CV00704BTMJLB, 2019 WL 1542300 (S.D. Cal. Apr. 9, 2019) ……………… 9

<u>Rules</u>

Fed. R. Civ. P. 37 ……………………………………………………………..…… 8

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SANCTIONS
CASE NO.:  3:17-CV-7303-MMC

## I.      INTRODUCTION

Unfortunately, the current Motion for Sanctions does little more than unnecessarily occupy the parties' and the Court's time and waste the parties' money. Defendant Trademark Engine LLC ("TME") brought the current motion despite Plaintiff LegalForce RAPC Worldwide, P.C. ("RAPC") continual willingness to placate TME, with little provided in return.

While RAPC agrees that the initial designations were regrettably too extensive, it has worked hard to down designate diligently to ensure that TME is not prejudiced.   RAPC has some remorse over this, and is quickly and swiftly taking remedial measures.   RAPC is a small business and is trying to litigate this case in house with very limited resources.   A simple look at the production numbers shows that the production by RAPC that TME is inadvertent.   RAPC has always quickly down designated documents accidently labeled HIGHLY CONFIDENTIAL when they are brought to its attention and endeavors to continue doing so proactively.[1]

At the center of the present motion is merely a dispute regarding the proper designation of survey communications (some of which are with customers of trademark filers who are NOT even customers of the Defendant).   In an effort to foster cooperation, RAPC already down-designated the majority of these communications for TME.   In good faith, RAPC feels that all the survey communications should be designated as Highly Confidential – Attorneys' Eyes Only ("AEO") because they contain information that TME can use to directly compete with RAPC by learning insights of viewpoints of trademark filing customers, but negotiated with TME and agreed to down-designate over 10,000 of the survey communications to merely confidential status. This constituted the bulk of the 18,126 records that RAPC produced and down-designation, therefore resulted in quite significantly reducing the percentage of

---

[1] It seems that TME should understand how these errors can occur considering that its own production also includes designating as confidential a publicly filed court document and a third party's publicly available terms of service from its website.  RAPC's own litigation attorneys are precluded from viewing the 53,423 documents designated as AEO by TME, so RAPC was limited to finding over-designated documents only in TME's non-AEO documents, which was relatively easy considering there are only 1,774 of them to search through. TME's production causes far greater harm to RAPC, increases its costs significantly, and restricts its ability to efficiently litigate this case with its own attorneys.

documents designated as AEO. TME asserted in its motion that RAPC's down-designation decreased the percentage of RAPC's AEO-designated documents from approximately 97% to 38.7%.

While RAPC has tried to act in good faith, TME has continually tried to find reasons to create sanctions motions against RAPC, ignoring the activities in their own backyard.   For example, the vast majority of TME's own production is unreasonably designated highly confidential (approximately 97% of documents produced by TME are designated as HIGHLY CONFIDENTIAL).

## II.   BACKGROUND FACTS

### A.   Protective Order

From the beginning of this case, RAPC has used its own internal litigation attorneys to prosecute its claims in this case. RAPC has only three attorneys working in its litigation department on this case. RAPC issued its first two sets of document requests to TME on November 20, 2018 and December 23, 2018, respectively. On February 4, 2019, the Court entered the parties' Stipulated Protective Order ("SPO"), which also included TME's demanded provision excluding RAPC's house counsel from access to AEO-designated material. (ECF No. 127.) Over four weeks later, on March 8, 2019, RAPC finally received TME's first documents produced pursuant to the SPO.

The SPO defines "Confidential" as those "things that qualify for protection under Federal Rule of Civil Procedure 26(c)." (SPO, 2.2.) It also defines AEO material as Confidential information or items, "disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means." (*Id.* at 2.8.) It further cautions against mass designations and provides that if a party learns of improper designations, then it shall promptly notify the other parties that it is withdrawing such designations:

> Mass, indiscriminate, or routinized designations are prohibited. Designations that are shown to be clearly unjustified or that have been made for an improper purpose (e.g., to unnecessarily encumber or retard the case development process or to impose unnecessary expenses and burdens on other parties) expose the Designating Party to sanctions.

1
2
3

> If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection at all or do not qualify for the level of protection initially asserted, that Designating Party must promptly notify all other parties that it is withdrawing the mistaken designation.

4   (*Id*. at 5.1.) Collectively, "Confidential" and AEO designated materials are Protected Material

5   within the SPO. (*Id*. at 2.16.) "Without written permission from the Designating Party or a court

6   order secured after appropriate notice to all interested persons, a Party may not file in the public

7   record in this action any Protected Material. (*Id*. at 12.3.)

8         **B.**      **TME's Assertions of Broad Over-Designations**

9         On Thursday July 11, 2019 TME first raised its allegation of broad over-designations of

10   various documents and demanded a meet and confer the following week. (*See* Decl. of Daniel P.

11   Kappes ("Kappes Decl."), ¶ 4, Ex. 2, ECF No. 149-1.) RAPC's lead counsel had already

12   informed TME that he would be in Boston and unavailable the week of July 17, 2019, but

13   conceded to have two meet and confers that TME was requesting that week if they were willing

14   to meet with RAPC's other house counsel. (*See* Joint Letter, July 30, 2019, 3-4, ECF No. 144.)

15         On July 16, 2019 TME then first discussed with RAPC in a meet and confer its

16   allegations of broad over-designations of various publicly available documents.[2] Decl. of

17   Nicholas Craft ("Craft Decl."), ¶¶ 3, 4. RAPC immediately began to investigate these

18   allegations. Just two days later, while still on vacation, RAPC's lead counsel notified TME's

19   counsel that RAPC was withdrawing the mistaken designations of various documents that it

20   learned had been mistakenly designated for protection. Decl. of Raj Abhyanker ("Abhyanker

21   Decl."), ¶ 3. Then RAPC began its review to locate such documents and to produce them again

22   to TME, as requested. On July 22, 2019, after TME provided specific examples of such

23   documents, RAPC notified TME that those designations were withdrawn and in a sign of good

24   faith also agreed to down-designate over 10,000 survey communications to confidential. *Id*. at ¶

25   4.

26

27   [2] Although TME claims that there were two meet and confers to discuss RAPC's designations,
28   only half of the meet and confer on July 16, 2019 was to address TME's allegation of
over-designation. The other half was used to discuss specific objections to RAPC's document
production responses, and the meet and confer on July 17, 2019 addressed TME's objections to
RAPC's interrogatory responses. Craft Decl. ¶¶ 3, 4.

1    Despite that meaning that over 10,000 documents would need to be individually reviewed

2    in order to change the designation one-by-one, RAPC agreed to produce the documents with

3    changed classifications on the document by the end of the next week, August 2, 2019. (Joint

4    Letter, July 30, 2019, 4, Ex. 8 ECF No. 144.) However, just a week later on July 29, 2019, and

5    in an effort to avoid additional time and costs to the parties and to the court, RAPC managed the

6    herculean effort of reviewing and changing the classifications on over 10,600 documents. (*Id*. at

7    4, Ex. 9.) The next day, TME notified RAPC that the format of providing the documents to

8    TME would cause them to need to re-review all the documents because it was not provided in

9    the form of replacement images. (*Id*. at 4, Ex. 10.) However, this does not appear to be TME's

10   position now, since the motion claims that they will still need to re-review the down-designated

11   documents and complains of the "sheer volume" that was down-designated. (Def.'s Mot. for

12   Sanctions, 7, ECF No. 149.) RAPC was able to provide the requested replacement images to

13   TME less than three and a half hours after TME raised an objection to how RAPC provided the

14   down-designated documents. Abhyanker Decl., ¶ 5. Regardless of these efforts, TME filed the

15   joint letter later that day, and now it appears the expressed urgent need for RAPC to provide

16   replacement images. All of this occurred in just two weeks after the meet and confer to discuss

17   TME's objection.

18   TME's Motion for Sanctions implies the alleged mass over-designation was raised on

19   April 24, 2019, but it is clear that false. (Def.'s Mot., 2-3 ("TME first questioned RAPC on its

20   use of the AEO designation on April 24, 2019, and formally requested that RAPC down

21   designate identified records"); *Id*. at 4 ". . . the draft Letter Brief, which simply reasserted the

22   issues TME had been raising with RAPC since April").) However, first, RAPC's production of

23   documents did not even begin until May 6, 2019. Abhyanker Decl., ¶ 7. Second, the only

24   "identified records" in that communication were the survey communications, which RAPC then

25   also explained to TME that it disagreed that those communications were over-designated and

26   felt they were properly protected as AEO. Decl. of Raj Abhyanker, ¶ 6. This is further proven

27   by the fact that the April 24, 2019 letter cited to in the motion, specifically only refers to the

28   survey communications. (Kappes Decl., ¶ 3, Ex. 1, ECF No. 149-1.) TME also states in that

letter that it was challenging the AEO designation of those communications "in accordance with Section 6.2 of the [SPO]," not Section 5.1. As explained above, Section 5.1 addresses allegations of mass over-designations; whereas Section 6.2, is clearly for challenging a specific designation. (SPO, 6.2, ECF No. 127 ("The Challenging Party shall initiate the dispute resolution process by providing written notice of each designation it is challenging and describing the basis for each challenge.") Nowhere in that letter does it mention any concerns regarding indiscriminate over-designation.

### C.   TME's Production By the Numbers

- TME produced a total of **55,197** documents. (Craft Decl. ¶ 7.)
- Of these, over **97%** are designated as AEO—**53,423**. (*Id*.)
- Less than **3%**, only **1,774** documents, are not designated as AEO. (*Id*.)
- Among the TME's over 55,000 documents there is only **one email with four attachments** that are not protected as being at least confidential. (*Id*. at ¶¶ 6, 7)

That means only ***five (5) documents*** are available to RAPC to file in the public record in this action. A couple of the documents that TME has chosen to protect as confidential include:

1. The publicly available civil cover sheet and instructions for a complaint filed by RAPC in the Northern District of California (TME0012975);

2. The terms of service for a third party's website that are presented upon completion of an order (TME0012828).

Given the numbers above, with only **0.009%** of the documents not being designated as protected, it seems likely that not protecting the five documents may have been an oversight by TME and they may have intended to protect them, so out of an abundance of caution these documents are not being filed with this opposition. The five documents simply consist of an email to RAPC's and TME counsels and providing a motion to consider whether the case should be related to another case, with the related documents (TME0071538 to TME0071554). Craft Decl. ¶ 6.

### III.   LEGAL STANDARD

Federal Rule of Civil Procedure 37 provides for sanctions to insure compliance with

1   discovery orders. Y*oungevity Int'l, Corp. v. Smith*, No. 16CV00704BTMJLB, 2019 WL

2   1542300, at *6 (S.D. Cal. Apr. 9, 2019). Sanctions for violations of a protective order apply

3   where there has been "willful disobedience of a court order . . . or when the losing party has

4   acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Roadway Exp., Inc. v.*

5   *Piper*, 447 U.S. 752, 766 (1980) (internal edit marks omitted). This also includes sanctions

6   against "counsel who willfully abuse judicial processes. *Id*. Bad faith "does not require that the

7   legal and factual basis for the action prove totally frivolous; where a litigant is substantially

8   motivated by vindictiveness, obduracy, or mala fides, the assertion of a colorable claim will not

9   bar the assessment of attorney's fees." *In re Itel Sec. Litig*., 791 F.2d 672, 675 (9th Cir. 1986).

10      TME provided several examples where sanctions were granted for a party's

11   confidentiality designations amounting to a violation of a protective order:

12         1.  Where the designating party failed to even meet and confer about the objected

13             designations. *Del Campo v. Am. Corrective Counseling Servs., Inc*., No.

14             C-01-21151JWPVT, 2007 WL 3306496, at *4 (N.D. Cal. Nov. 6, 2007)

15             (regarding documents designated as "confidential"); *Humphreys v. Regents of*

16             *Univ. of California*, No. C04-03808 SIEDL, 2006 WL 3020902, at *2 (N.D. Cal.

17             Oct. 23, 2006) (failing to meet and confer regarding "confidential" designations

18             despite a prior court order directing the parties to do so) (sanctions were awarded

19             in the subsequent order, 2006 WL 3302444 (N.D. Cal. Nov. 14, 2006)).

20         2.  Where the designating party initially failed to review any documents and

21             produced the entire discovery as AEO. *Youngevity Int'l Corp. v. Smith*, No.

22             16CV00704BTMJLB, 2017 WL 6541106, at *10 (S.D. Cal. Dec. 21, 2017) (the

23             designating party even failed to change any designations on the 4.2 million

24             documents after multiple meet and confers and interactions with the court);

25      However, an instance where sanctions were denied for allegations of over-designation of

26   documents as AEO is where the parties were competitors, the court had already considered

27   numerous confidentiality designation challenges under the SPO, but the designating party had

28   made an effort to down designate many of the AEO materials. *Ubiquiti Networks, Inc. v.*

*Kozumi USA Corp.*, No. 12-CV-2582 CW JSC, 2013 WL 772664, at \*3 (N.D. Cal. Feb. 28, 2013) (the court denied sanctions and ordered the parties to meet and confer further to resolve issues concerning the remaining documents).

## IV.   ARGUMENT

### A.   RAPC Initial Designation of Over 10,000 Survey Communications as AEO Was Justified

RAPC produced to TME over 14,000 survey communications that involved emails sent by RAPC to current or former customers of TME and LegalZoom.com, Inc. ("LegalZoom"), who RAPC was able to find using its own technological capabilities. This clearly the substantial majority of the 17,633 documents that TME alleges RAPC initially produced as AEO. Before RAPC even began its production to TME, it notified TME that these communications would be AEO for several reasons, including because it constituted trade secrets that could reveal the methodology for finding trademark customers, and is essentially a large trademark customer list. *See* Abhyanker Decl., ¶ 6. This AEO designation was specifically applied to this type of document prior to production, with specific knowledge of the contents of the documents and based on articulable reasons. This type of designation is far from mass, indiscriminate, or routinized designations. Obviously since there are over 14,000 similar documents the same confidentiality designation would also likely be the same. In this case they were survey communications to survey recipients who were also trademark customers of RAPC's competitors.

It is well-recognized that information or documents constituting customer lists can properly be protected as AEO material. *Nutratech, Inc. v. Syntech (SSPF) Int'l, Inc.*, 242 F.R.D. 552, 555 (C.D. Cal. 2007) (noting that confidential commercial information can be designated as AEO and that customer lists qualify as confidential commercial information that can be protected from disclosure to an opposing competitor party). RAPC expressed this justification to TME prior to even designating or producing the survey communications.

Furthermore, to maintain the integrity of a survey, several courts have recognized the need to protect survey respondents' identities. *Oklahoma v. Tyson Foods, Inc.*, in denying a motion to compel the identifying information of survey respondents, the court noted multiple

examples of cases around the country where the court determined that survey participant identifying information should be protected:

> A number of courts have similarly recognized the need to preserve the confidentiality of survey participants. *See, e.g., Applera Corp. v. MJ Research, Inc.*, 389 F.Supp.2d 344, 350 (D.Conn. 2005) ("researchers are prohibited by ethical rules from disclosing the actual individual identities of the survey respondents and instructed to defend against Court orders compelling disclosure"); *Farnsworth v. Proctor & Gamble Co.*, 758 F.2d 1545 (11th Cir. 1985) (prohibiting disclosure of respondent identities because of potential harm to social research surveying); *Lampshire v. Proctor & Gamble Co.*, 94 F.R.D. 58, 60 (N.D.Ga. 1982) (finding good cause to redact the personal identifying information of survey respondents and rejecting defendant's claim that this information was necessary to adequately test the validity of the survey) . . . .

No. 05-CV-329-GKF-PJC, 2009 WL 10271835, at *4 (N.D. Okla. Mar. 11, 2009).

RAPC's similar designation of survey communications that reveal the identities and contact information for the survey respondents was likewise appropriate and justified. Particularly of concern is that over 10,000 of these survey respondents are current or former customers of TME. TME would likely have even more information about those respondents and additional contact methods, that could be used along with their preexisting relationship to potentially exert influence over the respondents to change their mind or to intentionally taint the survey.

As TME noted, RAPC even discussed this specific designation with TME in April, prior to its first production in May, but RAPC disagreed with TME that the survey communications should not be AEO and expressed those reasons. None of that process for the 14,000 survey communications can be seen to be indiscriminate. It was a decidedly deliberative process. Regardless, in an effort to compromise, and after the survey was closed to additional responses, RAPC then agreed to down designate the survey communications with TME's customers. Appropriate, RAPC maintained the AEO designation on the survey communications with LegalZoom customers. It is likely that TME would agree with maintaining this designation since it would not likewise think it appropriate for RAPC to down designate and produce TME's customers' information LegalZoom either. Thus these 4,000 or so survey communications were intentionally maintained as AEO, and are part of that approximately 7,000 documents that retain

1   an AEO designation.

2   **B.      RAPC Acted Quickly to Cooperate When it Learned of Mistakes**

3   Similar to the parties in the trademark infringement and unfair competition case where

4   sanctions were not warranted (*Ubiquiti Networks, Inc. v. Kozumi USA Corp.*), here RAPC and

5   TME are competitors. 2013 WL 772664. However, unlike in that case, RAPC has only had one

6   meet and confer with TME in which it expressed a desire to correct any mistaken designations

7   and has expended significant effort to find the isolated examples of mistaken designations. On

8   top of that, in an act of goodwill and compromise, RAPC agreed to down-designate its survey

9   communications with TME customers, which RAPC felt could have justifiably retained an AEO

10  designations.

11  While still on vacation and after learning of specific examples of a handful of incorrect

12  designations that inadvertently slipped through the production, RAPC's lead counsel reacted

13  quickly to notify TME of documents from which it was withdrawing the mistaken

14  designation—publicly visible websites, job postings, undeliverable emails, public court filings,

15  court orders and summons, emails to TME's founder, and Freedom of Information Act requests.

16  *See* Abhyanker Decl. ¶¶ 3, 4. RAPC regrets that a handful of these documents managed to slip

17  through and were over-designated in its production, but it was not the result of a mass or

18  indiscriminate designation that would justify sanctions. Without specific Bates numbers to

19  lookup, RAPC committed to TME to begin re-reviewing its production and down designate any

20  any other instances of mistaken designations it came across, such as court filings or publicly

21  available website documents (like the examples TME itself has designated as confidential).

22  Even the handful of documents that TME now reports in its motion are still mistakenly

23  designated, would fall within those documents which RAPC already notified TME that it was

24  withdrawing the designations.

25  To that end, less than two weeks after speaking with TME about the mistaken

26  designations, RAPC reviewed and down designated over 10,000 documents.  RAPC could not

27  just down designate those in mass, and had to review each one to be sure there were not any

28  additional communication or information that would have otherwise required maintaining an

1   AEO designation on each document. Additionally, it searched for and down designated any

2   other documents it found that fit within the documents that RAPC had noticed to TME that it

3   was withdrawing mistaken designations from.

4       Indeed, TME complains that the "sheer volume" of documents that RAPC down

5   designated has been difficult to catalog. It is important to note that the vast majority of those

6   documents were not mistakenly or indiscriminately designated initially as AEO. They were

7   survey communications which TME had advocated for RAPC to down designate and RAPC

8   explained its reasons for maintaining the AEO protections, but RAPC down-designated in the

9   spirit of cooperation.

10   **C.    TME's Production Fails its own Motion for Sanctions**

11       TME's Motion for Sanctions condemns the exact type of discovery production that TME

12   itself has given to RAPC. Even worse, TME is aware that RAPC is litigating this case with its

13   own litigation attorneys and has engaged outside counsel for limited purposes, so that mass

14   designation of materials as AEO prejudices RAPC's ability to litigate this case to a much higher

15   degree.

16       TME's Motion for Sanctions argues that sanctions are justified because of the high

17   percentage of documents that were initially designated AEO, and because the designations of

18   many of the documents would cause court records to be shielded from the public's right to

19   access. First, TME alleges that despite RAPC down-designating almost 60% of its production,

20   that it should still be sanctioned because of initially designating 97% of the documents as AEO

21   because this reflected a lack of good faith before designating documents as Confidential or AEO

22   prior to production:

23           It is also well-established that the duty of "good faith before designating
        [documents] as ['Confidential'] or 'Attorney's Eyes Only'" exists **prior** to
24           production. *Paradigm Alliance, Inc. v. Celeritas Techs., LLC*, 248 F.R.D. 598, 605
        (D.Kan. 2008). Thus, RAPC failed to exercise its duty when it marked 97% of its
25           production as AEO. *THK Am., Inc. v. NSK Co., Ltd.*, 157 F.R.D. 637, 645 (N.D.
        Ill. 1993) (designation of 79% of produced documents as AEO was sanctionable
26           and "absurdly high").

27

28   (Def.'s Mot., 6 (emphasis in original).) TME chose to cite above that designating 79% of

1   produced documents as AEO is "absurdly high" and sanctionable. TME also states that this

2   obligation arises before production, without any objection from another party. (*Id*.) Yet, TME

3   has initially designated 97% of its own production as AEO—*the exact same percentage that*

4   *TME alleges demonstrates that RAPC failed to exercise a duty of good faith when*

5   *designating its production*. Currently, the percentages are obviously much different, since

6   RAPC has down-designated over 60% of its production and 97% of TME's production remains

7   shielded from RAPC's house counsel who are litigating this case. Therefore, RAPC still must

8   take on the added expense to engage outside counsel to handle any depositions, discovery, or

9   review that involves any of the 97%, 53,423 AEO-designated materials. This is a large burden

10  on RAPC and inhibits its ability to effectively litigate this case.

11       TME has not just alleged that this applies to AEO-designated documents, but also

12  apparently to the mass over-designation of documents as confidential. In *Humphreys v. Regents*

13  *of Univ. of California*, the court determined that sanctions were warranted for the

14  over-designation of documents as **confidential**, not AEO. 2006 WL 3020902, at *3 (N.D. Cal.

15  Oct. 23, 2006). TME's Motion for Sanctions cites to this case as support that sanctions are

16  warranted. (Def.'s Mot., 6.) Furthermore, the Motion for Sanctions looks to cases regarding the

17  public's right to access court records and notes that "This Court has already recognized that

18  parties must meet a heavy burden to overcome the 'strong presumption in favor of access to

19  court records,' requiring a showing of 'compelling reasons supported by specific factual

20  findings' to justify shielding such records from public view." (Def.'s Mot., 9.)

21       As explained in Section II.C above, of the 55,197 documents that TME produced, only

22  one email and its four attachments are not designated as being at least confidential. That means

23  that the amount of non-confidential documents in TME's production is only **0.009%**. The rest

24  must be filed under seal as protected material, per the terms of the SPO. (SPO, 12.3.) According

25  to TME, this type of behavior should not be tolerated because it "burdens this Court and is

26  interfering with the public's right to access records in this case." (Def.'s Mot., 9.)

27  **IV.    CONCLUSION**

28       For the foregoing reasons RAPC respectfully requests that Defendant's Motion for

Sanctions should be denied. RAPC also requests that the following sanctions be granted against TME for its waste in bringing this motion, and its mass over-designation of AEO and Confidential material given the standards it has asserted in its own Motion for Sanctions: (1)(a) de-designating the entirety of TME's documents currently designated as AEO, or (1)(b) modifying the SPO to allow RAPC's house counsel to access TME's AEO material; (2) ordering TME to provide a log explaining its justification for designating each document as AEO; (3) ordering TME to be limited to designating only 37% of its documents as AEO; and (4) awarding RAPC monetary sanctions for the costs it has expended to retain outside counsel to handle AEO documents and information.

Dated: August 16, 2019

Respectfully submitted,
LEGALFORCE RAPC WORLDWIDE P.C.

/Raj Abhyanker/

_____
Raj V. Abhyanker (233284)
Attorney for Plaintiff: LegalForce RAPC
Worldwide, P.C.